**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
EASTERN DIVISION**

| | |
|---|---|
| ANTONETTE GREER, | |
| Plaintiff, | No. C-03-2070-LRR |
| vs. | **ORDER** |
| BECK'S PUB & GRILLE, BECK ENTERTAINMENT, INC., BARMUDA CORPORATION, BECK TECH, INC., JOKERS CLASSIC ROCK EMPORIUM, JOKERS INCORPORATED and DARIN E. BECK, | |
| Defendants. | |

_____

*TABLE OF CONTENTS*

I.    INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **2**

II.   PROCEDURAL HISTORY  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **2**

III.  FACTUAL BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **5**

    A.   *Undisputed Facts* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **5**

    B.   *Disputed Facts*  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **9**

IV.   STANDARD FOR SUMMARY JUDGMENT . . . . . . . . . . . . . . . . . . . . **10**

V.    SUMMARY JUDGMENT ANALYSIS  . . . . . . . . . . . . . . . . . . . . . . . **12**

    A.   *Greer's Disparate Treatment Sex Discrimination Claims
       (Counts II and IV)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **12**

        1.   **McDonnell Douglas** *framework*  . . . . . . . . . . . . . . . . . . . **13**

        2.   *The prima facie case* . . . . . . . . . . . . . . . . . . . . . . . . . . . **15**

        3.   *The legitimate, nondiscriminatory reason*  . . . . . . . . . . . . . **16**

       *4.     Pretext* ................................... **17**

   **B.**    *Greer's Disparate Impact Sex Discrimination Claim (Count III)* ... **24**

   **C.**    *Greer's Discrimination in Public Accommodations Claim (Count V)* ..................................... **26**

   **D.**    *Greer's Retaliation in Public Accommodations Claim (Count VI)* .. **29**

   **E.**    *Greer's Public Policy Claim (Count I)* .................... **31**

**VI.**   **SUPPLEMENTAL JURISDICTION** ........................ **33**

**VII.**  **CONCLUSION** ..................................... **36**

## I. INTRODUCTION

The matter before the court is Defendants' Motion for Summary Judgment ("Motion") (docket no. 68), filed by defendants Beck's Pub & Grille, Beck Entertainment, Inc., Barmuda Corporation, Beck Tech, Inc., Jokers Classic Rock Emporium, Jokers Incorporated and Darin E. Beck [hereinafter collectively referred to as "Defendants"]. In this lawsuit, Plaintiff Antonette Greer's claims against Defendants arise from her employment at Beck's Pub & Grille and her relationship with her former boyfriend, Donald Sparkman. Greer contends she was discriminated against because of her sex, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*("Title VII"), and chapter 216 of the Iowa Civil Rights Act (the "ICRA"). She alleges wrongful discharge in violation of public policy, disparate treatment sex discrimination, disparate impact sex discrimination, and retaliation and sex discrimination in public accommodations.

## II. PROCEDURAL HISTORY

On August 22, 2001, Greer filed a charge of sex discrimination in employment with the Waterloo Commission on Human Rights. It was cross-filed with the Iowa Civil Rights Commission and the United States Equal Employment Opportunity Commission. Greer

alleged that Defendants discriminated against her based on sex. On November 21, 2001, Greer amended her charge with the Waterloo Commission on Human Rights and added claims.

On November 14, 2003, Greer filed a Complaint against Defendants in this court. In Count I, Greer alleges wrongful discharge in violation of public policy against Beck's Pub & Grille, Barmuda Corporation, Beck Entertainment, Inc., Beck Tech, Inc. and Darin E. Beck [hereinafter collectively referred to as "Employer Defendants"]. In Counts II and III, Greer alleges Title VII disparate treatment sex discrimination and disparate impact sex discrimination against the Employer Defendants. In Count IV, she alleges wrongful discharge under Iowa Code § 216.6 against the Employer Defendants. In Count V, Greer alleges discrimination in public accommodations under Iowa Code § 216.7 against Jokers Classic Rock Emporium, Jokers, Incorporated, Barmuda Corporation, Beck Entertainment, Inc., Beck Tech, Inc. and Darin E. Beck [hereinafter collectively referred to as "Jokers Defendants"]. In Count VI, Greer alleges a violation of Iowa Code § 216.11 against Defendants, because they retaliated against her for making a complaint under the ICRA. On January 14, 2004, Defendants filed an Answer.

On August 29, 2005, Defendants filed the instant Motion. Defendants argue summary judgment is appropriate on Greer's discrimination claims because she can neither establish a prima facie case of discrimination nor show that Defendants' reason for her termination is pretextual. Defendants further argue that only Defendant Beck Entertainment, Inc., d/b/a Beck's Pub & Grille [hereinafter "Beck's"] employed Greer and that no other Defendants could be properly named as defendants under Title VII. Defendants finally argue that because Greer can show no discriminatory practice with regard to public accommodations pursuant to Iowa Code § 216.7, summary judgment is

appropriate on her discriminatory practice and retaliation claims.[1] For the first time in Defendants' Reply brief, they assert that Greer's public policy argument does not survive summary judgment and, in the alternative, that, if the court grants summary judgment on Greer's Title VII claims, it should decline to exercise jurisdiction over Greer's public policy claim.[2]

On September 22, 2005, Greer filed a Resistance to Defendants' Motion for Summary Judgment and requested oral argument. On September 30, 2005, Defendants filed a Reply. On December 21, 2005, the court held a telephonic hearing on the Motion. Attorneys Deborah A. Widiss, Maya Raghu, Paige Ellen Fiedler and Ronnie L. Podolefsky represented Greer. Attorney Mark W. Fransdal represented Defendants. Finding the Motion to be fully submitted and ready for decision, the court turns to consider it.

---

[1] In their Motion, Defendants also argue that Greer's Complaint was insufficient to demonstrate a hostile or abusive work environment. In Greer's Resistance, however, she notes: "Defendants have misread Plaintiff's Complaint as pleading a hostile work environment sexual harassment claim. The Complaint lists no such count." (docket no. 72 at 7, n.5). Therefore, the court will not address this issue.

[2] Local Rule 56.1(a) requires a party moving for summary judgment to file a motion stating "each of the grounds for the motion." LR 56.1(a). Because Defendants failed to set forth arguments on Greer's public policy claim (Count I) in their initial motion for summary judgment, they cannot raise them in a reply brief. *See* LR 7.1(g) (noting that the purpose of a reply brief is "to assert newly-decided authority or to respond to new and unanticipated arguments made in the resistance"); *see also United States v. Martinson*, 419 F.3d 749, 753 (8th Cir. 2005) (noting that, in the appellate context, arguments raised for the first time in a reply brief need not be addressed).

## III.  FACTUAL BACKGROUND

### A.  Undisputed Facts

Greer was an employee of Beck's.  She worked as a dishwasher from May 5, 2000, to May 23, 2001.  During the time she worked at Beck's, Greer lived with her boyfriend, Donald Sparkman.  Sparkman began working as a busboy at Beck's on May 17, 2000. Between May 8, 2000, and May 21, 2001, Greer worked an average of 18.54 hours per week.  Between those same dates, Sparkman worked an average of 16.96 hours per week.

Both Greer and Sparkman are persons with special needs and disabilities.  Each received job coaching services during the time they were employed at Beck's.  Sparkman received job coaching services from Chris Reints of Exceptional Persons, Inc. ("EPI"). Greer received similar services from Terri Miller Roethler of Goodwill Industries of Northeast Iowa, Inc. ("Goodwill").

Greer and Sparkman had a tumultuous relationship.  While at work, they often engaged in verbal disagreements and called each other names, such as "bitch," "slut" and "retard."  Co-workers noticed their arguments and managers had to intervene to stop the arguments.  Between about January 2000 and April or May 2001, Kami Kazda was the general manager at Beck's.[3]  Kazda often "counseled" Greer and Sparkman about their verbal disagreements.  In addition to the arguments, Sparkman admits that he drank alcohol before coming to work on six or seven occasions during his first year of employment at Beck's and that his managers knew about the drinking.  Both Greer and Sparkman would have been fired "ten times over" for their inappropriate behavior had

---

[3] Kazda was no longer employed by Beck's when Greer was terminated on May 23, 2001.

they not been persons with special needs.  Defendants' Appendix in Support of its Motion [hereinafter "Defendants' App."] at 175.

Although Greer and Sparkman were tardy or absent about the same amount of time, Sparkman was the more responsible employee.  Sparkman always called-in if he was going to be a few minutes late, and he called-in several hours before his shift if he was going to be absent.  Sparkman did not receive a written Notice of Disciplinary Action until March 1, 2002.  Greer was known for coming into work several minutes late and for calling-in sick after her shift had started.  Greer was "one of the bottom" employees regarding tardiness and absenteeism out of Beck's kitchen staff.  *Id.*  Before Kazda left Beck's in April or May of 2001, she had conversations with then-assistant general manager Russell Heer, Barmuda Corporation's director of operations Jason Dugan, and other managers about the problems with Greer's tardiness and absenteeism.  Owner Darin E. Beck had numerous conversations with the management staff, including Candace Thein, Heer and Kazda, about Greer's tardiness and absenteeism.  Greer was given a written Notice of Disciplinary Action on September 7, 2000, for "excessive absenteeism."  Plaintiff's Appendix in support of its Resistance to Defendants' Motion [hereinafter "Plaintiff's App."] at 198.  Kazda and Heer both believe Sparkman was a better employee than Greer.

Roethler's progress notes of her meetings and discussions with Greer between June 2000 and May 2001 show Greer had consistent problems with tardiness and absenteeism.  Roethler regularly coached Greer about the importance of attendance and punctuality, because Greer had been fired several times in the past for such problems and had encountered similar problems at Beck's.

On May 18, 2001, Sparkman physically assaulted Greer at their home.  Greer called the police and officers arrested Sparkman.  On May 20, 2001, a state court entered a

no-contact order against Sparkman which prohibits him from having any contact with Greer. On May 21, 2001, Greer received a copy of the no-contact order in the mail.

Sparkman told Beck about assaulting Greer, and Beck characterized the assault as a "tiff." *Id.* at 73. After Beck learned about the protective order, he suggested to the management staff of Beck's that they attempt to schedule Greer and Sparkman for opposite hours. Beck believes that, because Greer would arrive at Beck's and argue with Sparkman when he was scheduled to work, the attempt to schedule Greer and Sparkman at different times was "very unsuccessful." *Id.* at 75.

Due to being arrested after the May 18, 2001 assault, Sparkman did not work from May 19, 2001, through May 22, 2001.

Greer was tardy on May 22, 2001, and received written discipline for that tardiness. Thein was the kitchen manager at that time. Thein, Heer and assistant kitchen manager Gabriel Rodriguez were involved in Greer's termination from Beck's on May 23, 2001. Thein wrote and signed the Notice of Disciplinary Action form. Heer and Rodriguez met with Greer and delivered the news of her termination to her. Neither Beck nor other managers were involved in making the decision to terminate her. Beck did not learn about the termination until he was notified by Heer and Thein and saw the disciplinary action form. At the time Thein terminated Greer, Thein did not know about the no-contact order. The disciplinary action form, which documents Greer's termination, indicates that she was terminated for "tardiness" and that her "conduct" was "poor." *Id.* at 199. It further provides that her attendance was "average." *Id.*

After Greer was terminated, Roethler had a conversation with Heer. Pursuant to such conversation, Heer told Roethler that he and Thein terminated Greer due to her punctuality, the no-contact order and the fact that Sparkman was a better employee than Greer.

Both before and after May 23, 2001, Defendant Jokers Incorporated, d/b/a Defendant Jokers Classic Rock Emporium, held non-alcoholic parties from 5:30 p.m. to 7:30 p.m. on Monday nights. The Monday night parties were held for the employees and clients of EPI, Goodwill and other similar agencies. Generally, members of the public did not attend the Monday night parties. However, if members of the public arrived at the door and wanted to attend after being told Jokers was hosting a non-alcoholic party for disabled individuals, they were permitted to do so. Greer and Sparkman both attended these parties both prior to and during 2001.

After the no-contact order was in place, a schedule was created[4] which permitted Greer and Sparkman to attend the Monday night parties on an alternating basis. That is, Greer would attend one Monday night party and Sparkman would attend the next Monday night party. If either Greer or Sparkman arrived at Jokers on a night that was designated for the other, the door staff at Jokers would refuse admittance and ask the non-scheduled person to leave. On Monday, November 12, 2001, Greer was denied entry into Jokers because, pursuant to the schedule, it was Sparkman's night to attend the party. Beck learned about Greer's attempt to enter Jokers on Sparkman's designated night on November 12, 2001, when Jokers employees called Beck at home shortly after the incident.

The parties agree that Greer never violated any rules at Jokers that would have justified excluding her from the establishment. She only attempted to attend the Monday night parties on a night that was designated as Sparkman's night under the alternating schedule.

---

[4] The parties dispute who created and enforced the schedule.

On June 7, 2001, Sparkman violated the no-contact order by entering Greer's apartment at night. He yelled at her and choked her in her bed. As a result of the violation, Sparkman spent August 23, 2001, through August 28, 2001, in jail. Sparkman was not disciplined for missing work while he was in jail because he called-in prior to his shifts to report that he would be absent and Beck considered the absences "out of [Sparkman's] control." *See id.* at 84.

## B. Disputed Facts

Greer claims that, on May 22, 2001, just after receiving the no-contact order, she called then-general manager Russ Heer and asked him to re-arrange her schedule so that it did not overlap with Sparkman's schedule. Defendants claim that Heer has no recollection of being notified by Greer about the no-contact order.

Greer claims that Sparkman "regularly approached" her at Beck's and yelled profanities and vulgar names, such as "fucking bitch." She claims that various managers at Beck's observed Sparkman's behavior. Greer further claims that, in addition to the name-calling, Sparkman sometimes would slam dishes down beside Greer so hard that they would break. Defendants claim that during Greer's employment at Beck's, there were only four or five occasions during which Sparkman "approached her . . . stating profanities." According to Defendants, each incident lasted two minutes or less. Defendants claim that those incidents never caused Greer to leave work early, quit working, talk to Sparkman after work or move out of their shared home.

Greer claims that Sparkman assaulted her at their home on May 18, 2001, by kicking her in the shin and hitting her in the shoulder with a closed fist. Defendants claim that, after three years of Greer hitting Sparkman, Sparkman "got mad" and pushed and hit Greer. Defendants claim that Greer admitted there was no mark on her shin or shoulder.

Greer claims that Reints suggested the alternating Monday night schedule at Jokers and communicated the plan to Roethler. Although Roethler spoke with Greer about the alternating schedule, Greer claims that she never agreed to it. Defendants claim that Greer agreed to the schedule but that she occasionally failed to follow the alternating plan. The parties disagree about who, specifically, asked Greer to leave Jokers on Monday, November 12, 2001. Some evidence suggests Kelly Moat, who is a Goodwill employee, asked Greer to leave, and other evidence shows Steven Carter and Brad Flanagan, who were Jokers employees, asked her to leave.

Defendants further claim that Greer chose not to return to Jokers since November of 2001. Greer claims that she has not returned to Jokers on a Monday night since November 2001, because she understood that she was "specifically banned" from the establishment. Greer claims that she is permanently banned from Jokers because Beck maintains that Greer may only return to Jokers for the Monday night parties if she agrees to the alternating week schedule.

## IV. STANDARD FOR SUMMARY JUDGMENT

Summary judgment is appropriate only when the record shows there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Woods v. DaimlerChrysler Corp.*, 409 F.3d 984, 990 (8th Cir. 2005). An issue of fact is "genuine" if it has a real basis in the record, *Hartnagel v. Norman*, 953 F.2d 394, 395 (8th Cir. 1992) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)), or when "'a reasonable jury could return a verdict for the nonmoving party' on the question." *Woods*, 409 F.3d at 990 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A fact is material when it is a fact "'that might affect the outcome of the suit under the governing law . . . .'" *Johnson v. Crooks*, 326 F.3d 995, 1005 (8th Cir. 2003) (quoting *Anderson*, 477 U.S. at

248).  In considering a motion for summary judgment, a court must view all facts in the light most favorable to the nonmoving party.  *Matsushita Elec. Indus.*, 475 U.S. at 587-88. Further, the court must give such party the benefit of all reasonable inferences that can be drawn from the facts.  *Id.* at 587.

Procedurally, the moving party bears "the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the record which show a lack of a genuine issue." *Hartnagel,* 953 F.2d at 394 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).  Once the moving party has successfully carried its burden under Rule 56(c), the nonmoving party has an affirmative burden to go beyond the pleadings and by depositions, affidavits, or otherwise, designate "specific facts showing that there is a genuine issue for trial."  Fed. R. Civ. P. 56(e); *Anderson*, 477 U.S. at 248. The nonmoving party must offer proof "such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson*, 477 U.S. at 248.

The Eighth Circuit Court of Appeals has cautioned that "summary judgment should seldom be used in employment-discrimination cases." *Crawford v. Runyon,* 37 F.3d 1338, 1341 (8th Cir. 1994) (citing *Johnson v. Minn. Historical Soc'y,* 931 F.2d 1239, 1244 (8th Cir. 1991)).  Summary judgment is appropriate in employment discrimination cases only in "those rare instances where there is no dispute of fact and where there exists only one conclusion."  *Johnson*, 931 F.2d at 1244.   To put it another way, "[b]ecause discrimination cases often depend on inferences rather than on direct evidence, summary judgment should not be granted unless the evidence could not support any reasonable inference for the nonmovant." *Crawford,* 37 F.3d at 1341.

Nevertheless, the Eighth Circuit Court of Appeals has also observed that, "[a]lthough summary judgment should be used sparingly in the context of employment discrimination cases, the plaintiff's evidence must go beyond the establishment of a prima

facie case to support a reasonable inference regarding the alleged illicit reason for the defendant's action." *Landon v. Northwest Airlines, Inc.*, 72 F.3d 620, 624 (8th Cir. 1995) (citation and internal citation omitted); *accord Kiel v. Select Artificials, Inc.*, 169 F.3d 1131, 1134-35 (8th Cir. 1999) (observing that the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), must be used to determine whether summary judgment is appropriate).

## V. SUMMARY JUDGMENT ANALYSIS

### A. Greer's Disparate Treatment Sex Discrimination Claims (Counts II and IV)

In Counts II and IV of the Complaint, Greer claims disparate treatment sex discrimination under Title VII and the ICRA. Greer claims that she was a member of a protected class, she was capable of performing her job, and she was terminated due to her gender while a similarly situated man, namely Sparkman, was not terminated.

Defendants move for summary judgment on Greer's disparate treatment sex discrimination claims. Defendants argue that Greer cannot establish a prima facie case of sex discrimination, because she cannot show that her discharge occurred under circumstances giving rise to an inference of discrimination. Defendants further contend that, even if Greer is able to establish a prima facie case, she cannot produce evidence sufficient to create a genuine issue of material fact on the issue of whether Defendants' stated reasons for her termination are a pretext for sex discrimination.

The court will use the same framework to analyze all of Greer's discrimination claims, whether brought under Title VII or the ICRA. Iowa courts have traditionally turned to federal law for guidance in analyzing claims under the ICRA. *King v. Iowa Civil Rights Comm'n*, 334 N.W.2d 598, 601 (Iowa 1983); *see Vivian v. Madison*, 601 N.W.2d 872, 873 (Iowa 1999) (explaining that the ICRA was modeled after Title VII and that federal precedent is applicable to discrimination claims under the ICRA). Although the

Iowa Supreme Court has recently indicated it will entertain arguments that the ICRA can be interpreted differently than Title VII, neither party asks the court to deviate here. *See McElroy v. State*, 703 N.W.2d 385, 391 (Iowa 2005) (declining to interpret ICRA differently than Title VII where neither party so argued, but indicating that, although Iowa courts have traditionally looked to federal law for guidance in interpreting the ICRA, they are not bound to federal law and may deviate from it if the parties argue for a deviation from the federal analysis).

There are two methods by which a plaintiff can demonstrate intentional discrimination based on sex under Title VII and ICRA. First, the plaintiff may provide "direct evidence of conduct or statements by persons involved in the decision-making process, which indicate a discriminatory attitude was more likely than not a motivating factor in the employer's decision." *Kratzer v. Rockwell Collins, Inc.*, 398 F.3d 1040, 1046 (8th Cir. 2005) (citing *Price Waterhouse v. Hopkins*, 490 U.S. 228, 258 (1989)). "If there is direct evidence of sex discrimination, the burden rests with the employer to show that it more likely than not would have made the same decision without consideration of the illegitimate factor." *Id.* (citing *Price Waterhouse*, 490 U.S. at 258). Second, if the plaintiff has no direct evidence of discrimination, the plaintiff may present indirect evidence of discrimination, employing the framework originally set forth in *McDonnell Douglas*. *Id.* "The *McDonnell Douglas* framework exists to provide discrimination plaintiffs a way to prove their case when they do not have explicit, inculpatory evidence of discriminatory intent." *Id.* (citations and internal quotation marks omitted).

### 1. **McDonnell Douglas** *framework*

The parties agree that Greer has presented no direct evidence of discrimination, therefore, her claims must be analyzed under the burden-shifting framework of *McDonnell Douglas*. *See Breeding v. Arthur J. Gallagher & Co.*, 164 F.3d 1151, 1156 (8th Cir.

1999) (citing *McDonnell Douglas*, 411 U.S. at 802-03). Under this framework, the plaintiff bears the initial burden of establishing a prima facie case of discrimination. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993). To make out a prima facie case of sex discrimination under Title VII or the ICRA, a plaintiff need show that: (1) she is a member of a protected class; (2) she was qualified to perform her job; (3) she suffered an adverse employment action; and (4) that nonmembers of her class (i.e., persons of the opposite gender) were not treated similarly. *Breeding*, 164 F.3d at 1156. If the plaintiff meets this burden and establishes a prima facie case by a preponderance of the evidence, a presumption of discrimination arises. *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981). At this point, the plaintiff is entitled to judgment as a matter of law unless the defendant successfully rebuts the presumption. *St. Mary's Honor Ctr.*, 509 U.S. at 510. The burden shifts to the employer to "demonstrate a legitimate, nondiscriminatory reason for the adverse employment action." *Breeding*, 164 F.3d at 1156. If the employer articulates such a nondiscriminatory reason, the plaintiff may attempt to establish that she was the victim of intentional discrimination "by showing that the employer's proffered explanation is unworthy of credence." *Burdine*, 450 U.S. at 256. Moreover, although the presumption of discrimination "drops out of the picture" once the defendant meets its burden of production, *St. Mary's Honor Ctr.*, 509 U.S. at 511, the trier of fact still may consider the evidence establishing the plaintiff's prima facie case "and inferences properly drawn therefrom . . . on the issue of whether the defendant's explanation is pretextual," *Burdine*, 450 U.S. at 255, n.10.

In *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133 (2000), the Supreme Court reiterated that "'[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.'" *Id.* at 142 (quoting *Burdine*, 450 U.S. at 253). Thus, what Greer's evidence

must show to avoid summary judgment or judgment as a matter of law, is: "'1, that the stated reasons were not the real reasons for [Greer's] discharge; *and* 2, that [sex] discrimination was the real reason for [Greer's] discharge.'" *Id.* at 153 (quoting the district court's jury instructions and concluding that such instructions properly stated the law). The Supreme Court clarified in *Reeves* that "a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." *Id.* at 148. Moreover, the Iowa Supreme Court has instructed, with regard to the ICRA, that "[w]hether judgment as a matter of law is appropriate . . . will depend upon a number of factors, including the strength of the plaintiff's prima facie case and the probative value of the proof the employer's explanation is false." *Smidt v. Porter*, 695 N.W.2d 9, 15 (Iowa 2005).

### 2. *The prima facie case*

Even though it is mindful of the "low-threshold standard" for determining whether employees are similarly situated, the court finds Greer failed to prove the fourth element of her prima facie case. *See Rodgers v. U.S. Bank*, 417 F.3d 845, 852 (8th Cir. 2005) (noting that "'[t]he burden of establishing a prima facie case of disparate treatment is not onerous,'" and explaining that the court "must not conflate the prima facie case with the ultimate issue of discrimination") (quoting *Burdine*, 450 U.S. at 253). Under this low-threshold standard, Greer must merely show that she and Sparkman were "'involved in or accused of the same or similar conduct and were disciplined in different ways.'" *Id.* (quoting *Wheeler v. Aventis Pharms.*, 360 F.3d 853, 857 (8th Cir. 2004)). Greer attempts to show that Sparkman was a similarly situated male who was treated differently than she was because after she obtained the no-contact order, she was fired and he was retained as an employee at Beck's. Greer's argument fails, because she and Sparkman not only

performed different jobs—she was a dishwasher employed as a kitchen staff employee and he was a busboy employed as a front house employee—but Greer has not presented any evidence that Sparkman was involved in similar misconduct. Greer has not shown that Sparkman had similar problems with tardiness and absenteeism. The record is nearly void of evidence of Sparkman's deficient job performance during the relevant periods.[5]

### 3. The legitimate, nondiscriminatory reason

Even if Greer established her prima facie case of gender discrimination, the court finds Defendants articulated a legitimate, nondiscriminatory reason for terminating Greer's employment. *See Rodgers*, 417 F.3d at 853 ("'The burden to articulate a nondiscriminatory justification is not onerous, and the explanation need not be demonstrated by a preponderance of the evidence.'" (quoting *Floyd v. Mo. Dep't of Soc. Servs., Div. of Family Servs.*, 188 F.3d 932, 936 (8th Cir. 1999)). It is "a burden of production, not persuasion, and no credibility assessment is involved." *Smidt*, 695 N.W.2d at 15.

Defendants claim Greer was terminated because she was habitually tardy and absent. The undisputed evidence shows that Roethler constantly coached Greer about tardiness and absenteeism between June 2000 and May 2001. Defendants have shown that Beck and his managers, including Kazda, Heer, Dugan, Ted Abernathey and Rodriguez, had each discussed Greer's problems with attendance and tardiness prior to the time Greer obtained the no-contact order. Moreover, Thein, the kitchen manager who terminated Greer,

---

[5] The record includes two written disciplinary warnings against Sparkman. The first written warning Sparkman received for absenteeism was on March 1, 2002 (Plaintiff's Appendix in support of its Resistance to Defendants' Motion [hereinafter "Plaintiff's App.] at 202), and the second was on March 1, 2003 (Plaintiff's App. at 203). Therefore, both written warnings came well-after the time Greer was fired on May 23, 2001.

testified that she neither knew about the no-contact order nor discussed it with Heer prior to terminating Greer for tardiness and absenteeism. Therefore, assuming Greer's claims survived the prima facie stage of the summary judgment analysis, Defendants have rebutted the presumption of discrimination and it is up to Greer to show that a reasonable jury could find that Defendants' proffered reason for her termination is "unworthy of credence." *See Burdine*, 450 U.S. at 256.

### 4. Pretext

"[T]he showing of pretext necessary to survive summary judgment requires more than merely discrediting an employer's asserted reasoning for terminating an employee." *Johnson v. AT&T Corp.*, 422 F.3d 756, 763 (8th Cir. 2005). "At the pretext stage of the *McDonnell Douglas* burden-shifting framework, the test for determining whether employees are similarly situated to a plaintiff is a rigorous one." *Rodgers*, 417 F.3d at 853. Greer "must show that she and the employees outside of her protected group were similarly situated in all relevant respects." *Id.* (citing *Wheeler*, 360 F.3d at 858). In other words, Greer and Sparkman must be employed in similar positions and their levels of misconduct must have been similar. *See, e.g.*, *Grabovac v. Allstate Ins. Co.*, 426 F.3d 951, 956 (8th Cir. 2005) (noting that a male employee was not "similarly situated in all relevant respects" to the plaintiff because they held different positions—the male employee was an agency consultant manager while the female plaintiff was a marketing business consultant); *Jordan v. City of Gary, Ind.*, 396 F.3d 825, 835 (7th Cir. 2005) ("[I]n order to be considered similarly situated[,] an employee must be 'directly comparable in all material respects.'" (quoting *Hudson v. Chicago Transit Auth.*, 375 F.3d 552, 561 (7th Cir. 2004)); *Salguero v. City of Clovis*, 366 F.3d 1168, 1177 (10th Cir. 2004) ("Because the facts indicate significant differences in conduct, allegations of disparate discipline do not suffice to show pretext."); *Wheeler*, 360 F.3d at 858 (concluding that plaintiff and

members of the protected group were not similarly situated because their actions "involved differing levels of misconduct" and in order to be similarly situated for pretext purposes, they must be "involved in or accused of the same offense and are disciplined in different ways").

Greer attempts to prove Defendants really terminated her because she is a woman. She argues that Sparkman was a similarly situated employee and, even though he yelled at work, consumed alcohol before going to work and had absenteeism problems, Sparkman was retained because he is a man. Defendants argue that the record is absolutely void of any evidence that Greer was terminated because she is a woman. Defendants argue that, although the record contains evidence that Greer was terminated because either she or Sparkman needed to be terminated due to the logistical problems caused by the no-contact order, the decision to terminate Greer rather than Sparkman was based upon who was the better employee. The decision was in no way motivated by gender considerations.

It is undisputed that Greer and Sparkman both have special needs and they were treated more leniently than other employees because of those needs. *See* Defendants' App. at 174-75 (explaining that "a regular employee would have been terminated ten times over" if he or she had acted the way Greer and Sparkman acted at work). They both engaged in inappropriate conduct, which included arguing with each other in the workplace, and they both had problems with tardiness and absenteeism. *See, e.g.*, *id.* at 167A-168 (explaining how both Greer and Sparkman had been counseled by management several times and disciplined due to the fights they engaged in within the workplace); *id.* at 172 (explaining that Greer and Sparkman were "probably tardy just about the same amount"); *id.* at 201 (describing how the two would raise their voices during arguments and managers would eventually have to split them up); Plaintiff's App. at 62 (explaining how managers

would have to tell the two to "save it for home" when they raised their voices and engaged in arguments).

Despite these similarities, the record is replete with undisputed evidence that Greer and Sparkman did not engage in similar levels of misconduct. Greer has presented no evidence that Sparkman's tardiness and absenteeism problems rose to the level of her own. In fact, according to the undisputed deposition testimony of general manager Kazda, Sparkman's attendance issues were dissimilar to Greer's because Sparkman always called-in to notify his managers if he was running a few minutes late and always provided ample notice if he was ill. Kazda provided the following undisputed testimony:

Q. Was Antonette a good dishwasher?

A. When she was there.

Q. You didn't have any performance problems from her doing her actual job?

A. No.

Q. Did she have problems of being late?

A. Yes.

Q. Tell me about those.

A. She was constantly tardy. If she was late it was at least always is [sic], twenty minutes late. It wasn't a minute here, a minute there. Half the time she was not going to show up or would call an hour or so into it and say I am not coming. I don't feel well.

Q. An hour before the shift or after?

> A.     After.  Not a lot of warning and enough time to find
>         somebody to fill in for her.

Defendants' App. at 168-69.  Kazda further testified:

> I would bet [Greer and Sparkman] were probably tardy just
> about the same amount.  But [Sparkman] would call ahead if
> he was not coming to work and give us ample time to find
> another person to cover that shift.  Or, if we couldn't find
> anybody you could call [Sparkman] and he would come to
> work.  Whereas, if [Greer] called in past the point of
> scheduled time, or if she didn't show up at all, if you tried to
> contact her that day she wouldn't answer the phone or even
> attempt to contact us and would show up on the next shift as
> if nothing was wrong.

*Id.* at 172.  Kazda testified that Sparkman always called-in "several hours before the shift"
if he was going to be absent or a few minutes late.  *Id.* at 170-71.  Kazda and Heer both
testified that Sparkman was a better employee than Greer.  *Id.* at 173, 187; *see also id.* at
201 (co-worker Steven Carter testifying that Sparkman was a "great worker" and Greer
was only sometimes a good dishwasher, depending on her mood).  *But see* Plaintiff's App.
at 62 (Gabriel Rodriguez testifying that, although Greer was not the fastest dishwasher, she
was a "good dishwasher" who "did her job").  Although Kazda stopped working at Beck's
shortly before the time Greer was terminated on May 23, 2001, during the course of
Greer's employment, Kazda, Beck and other managers, including Heer, Dugan and
Abernathey, discussed terminating Greer due to tardiness and the fact that she constantly
complained about feeling ill.  Defendants' App. at 167, 171, 193.

The evidence from Greer's job coach shows that Greer had major difficulties with
attendance.  Roethler's progress notes show that when Roethler began supervising Greer
on about June 22, 2000, the team of individuals involved with Greer agreed that she
needed assistance with attendance.  *Id.* at 32.  On September 7, 2000, Greer was given a

written Notice of Disciplinary Action because she had called-in sick fifteen minutes before her shift and failed to find a replacement worker for her shift. Plaintiff's App. at 198. Roethler's progress notes show that, on September 11, 2000, a Beck's manager called her to report that Greer had again called-in sick without covering her shift and that the attendance problem with Greer was "habitual." Defendants' App. 35. On September 13, 2000, Roethler spoke with Greer about her attendance at work because Greer's "supervisor at Beck's" called again and reported that Greer "has been calling in sick and not finding a replacement as required." *Id.* at 36. Greer admitted in her deposition that in the "several months" preceding September 18, 2000, she was "missing a lot of work." *Id.* at 14.

On November 27, 2000, Roethler's notes reflect that, during her discussions with Greer about her failure to obtain a raise in pay, Greer agreed that her attendance problems may have been the reason she had not received a raise. *Id.* at 37. On November 30, 2000, Greer was five minutes late for work and Roethler discussed attendance and punctuality with her. *Id.* On December 5, 2000, Roethler encouraged Greer to attend work even though she was not feeling well and they made arrangements for Greer to call Roethler if Greer was planning to call-in sick to work. *Id.* at 38. On December 13, 2000, Greer called Roethler to tell her that she was not going to work because her back hurt, and Roethler spoke with Greer about attendance. *Id.* On December 20, 2000, Roethler wrote that Greer "continues to need a great deal of support regarding attendance." *Id.* On January 3, 2001, Greer informed Roethler that she had left work early on January 2, 2001, and did not plan to go to work on January 3, 2001. *Id.* On January 5, 2001, Greer called Roethler and told Roethler that "she was not sure she was going to work today" because her arm hurt. *Id.* A few days later, Greer received a doctor's excuse for two days off of work because of problems with her shoulder. *Id.* at 38-39.

On January 22, 2001, Roethler discussed attendance with Greer and on February 12, 2001, Roethler wrote: "[Greer] continues to need many prompts regarding her attendance. Staff stressed the importance of good attendance to [Greer]." *Id.* at 39. Roethler's progress notes from the rest of February 2001 indicate Greer was doing much better with attendance "in the last several months." *Id.* On March 13, 2001, Greer called Roethler to report that she was ill and was not going to work, but had found a replacement. *Id.* at 40. Again, Roethler discussed the "importance of good attendance" with Greer. *Id.* On March 27, 2001, Greer was ten minutes late to work because she had overslept and, on April 6, 2001, she called-in sick with only one-half hour notice. *Id.* On May 17, 2001, Roethler reported that Greer's attendance had been "fair" and Roethler again reminded Greer of the importance of good attendance. *Id.* Greer admitted in her deposition that Roethler spoke with her about attendance and tardiness on "a number of occasions" during the period she worked at Beck's. *Id.* at 13.

On the Notice of Disciplinary Action form which memorializes Greer's termination, kitchen manager Thein wrote: "[Greer] is tardy on a regular basis, always at least half hour late to 45 minutes late, will call after 45 minutes late to tell us she's running late. Looks bad on other employees. Due to excessive tardiness she will be terminated from this work environment." *Id.* at 134. In her deposition, Greer confirmed that she was "tardy on a regular basis." *Id.* at 15. Therefore, although Greer only received a written warning once prior to her termination, the evidence is undisputed that attendance was a constant problem for Greer during nearly the entire term of her employment with Beck's.[6]

---

[6] The undisputed facts also show that Greer lost several jobs prior to working at Beck's due to "low attendance." Defendants' App. at 14.

Summary judgment is appropriate because Greer cannot show Defendants' reason for terminating her was pretextual. She has presented no evidence that Sparkman's problems with tardiness and absenteeism were similar to her own. Moreover, Greer and Sparkman were not employed in similar positions—Greer was a dishwasher and Sparkman was a busboy. The record shows they worked in different parts of the restaurant, were supervised by different managers and completed different tasks. Viewing the undisputed evidence in the light most favorable to Greer, it shows that, although both Greer and Sparkman had problems with tardiness and absenteeism, the extent of their problems were not similar. *See Wheeler*, 360 F.3d at 858 (discussing "differing levels of misconduct"); *see also MacKenzie v. City and County of Denver*, 414 F.3d 1266, 1277 (10th Cir. 2005) (finding plaintiff failed to establish a prima facie case because the comparable employees were not similarly situated where they worked under a different supervisor and engaged in misconduct that was "fundamentally distinct" from the plaintiff's misconduct).

There is also evidence in the record that Greer was terminated due to the no contact order. For example, Roethler's notes from May 23, 2001, reflect that: (1) she spoke with general manager Heer after Greer's termination, and (2) Heer told Roethler that Greer's "punctuality was not good" and that she was also terminated due to the fact that there was a no-contact order involving Sparkman and Sparkman was the better employee. Defendants' App. at 42. Although general manager Heer testified that he does not remember a lot about the termination, he confirmed that he would have fired Greer, rather than Sparkman, if one of them had to be terminated due to the no-contact order because Sparkman was the better employee. *See id.* at 184, 187. Although Beck was not involved in Greer's termination and only found out about it after the fact, he also testified that Greer was terminated due to the no-contact order because Sparkman was the better employee. The record is, however, completely void of any direct evidence that Defendants chose to

terminate Greer, rather than Sparkman, due to their genders.  In fact, kitchen manager Thein, the person who signed the written termination notice and made the decision with Heer to terminate Greer, testified that she was not aware of the no-contact order before the decision was made to terminate Greer.  *Id.* at 178.  Therefore, the court finds that, even if the no-contact order factored into the termination discussions, the undisputed evidence shows that the ultimate decision to terminate Greer was based upon which employee was the better employee.  It was not based upon considerations of gender.

The court finds that Greer cannot establish a prima facie case of disparate treatment discrimination.  However, the court further finds that Defendants have shown a legitimate nondiscriminatory reason for terminating Greer and she has not raised a question of material fact that Defendants' reason is pretextual.  When viewing the evidence in the light most favorable to Greer, it shows that Sparkman was not a similarly situated employee because he was employed by Beck's in a different position and his level of misconduct was dissimilar to Greer's attendance and tardiness problems.  The court shall grant Defendants' Motion on Counts II and IV.

## B.  Greer's Disparate Impact Sex Discrimination Claim (Count III)

In Count III, Greer alleges disparate impact sex discrimination.  Greer claims she was terminated from Beck's because she was a victim of domestic violence and obtained the no-contact order against Sparkman.  Defendants argue that the decision to terminate Greer and retain Sparkman was based upon the fact that Sparkman was the better employee.  They argue that it was a gender neutral decision that has no disparate impact on women.

To establish a prima facie case of disparate impact, Greer must show that Defendants use "'employment practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one [protected] group . . . without

adequate justification.'" *Langlie v. Onan Corp.*, 192 F.3d 1137, 1140 (8th Cir. 1999) (quoting *Houghton v. SIPCO, Inc.*, 38 F.3d 953, 958 (8th Cir. 1994)). "'To prove discrimination under this theory, a plaintiff must identify . . . a facially-neutral employment practice, demonstrate a disparate impact upon the group to which he or she belongs, and prove causation.'" *Id.* (quoting *Lewis v. Aerospace Cmty. Credit Union*, 114 F.3d 745, 750 (8th Cir. 1997)). With regard to causation, Greer must offer "'statistical evidence of a kind and degree sufficient' to raise an inference that the practice in question has caused significant adverse effects on the members of a protected group because of their membership in the group." *Id.* (quoting *Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 994 (1988)).

Greer has presented statistical evidence showing that women are much more likely to be the reported victims of domestic violence, that they constitute 95% of persons seeking services from certain domestic violence service programs in Iowa and that they are much more likely than men to obtain a protective order when physically assaulted by an intimate partner. Plaintiff's App. at 250-52. Therefore, the undisputed evidence shows that women are much more likely than men to be the victim who is protected by a no-contact order. These statistics are, however, irrelevant here because Greer failed to show that Defendants' "practice" of terminating her has a disparate impact on women. Greer did not prove that Defendants have an established policy or practice which includes a procedure for terminating the female employee, rather than the male, when a no-contact order is put into place involving co-employees.

The court finds there is no evidence in the record of Defendants' employment practices having a disproportionately adverse impact on women or, specifically, female

victims of domestic violence. Summary judgment shall be granted on Count III, because Greer has not established a prima facie case of disparate impact discrimination.[7]

### C.  Greer's Discrimination in Public Accommodations Claim (Count V)

In Count V, Greer alleges that the Jokers Defendants discriminated against her in public accommodations, in violation of Iowa Code § 216.7, because they excluded her from Jokers on Monday, November 12, 2001. Greer argues that after she had obtained the no-contact order and filed her administrative action, the Jokers Defendants refused her entry into Jokers. In their Motion, Defendants argue that Greer has not shown that the Jokers Defendants engaged in a discriminatory practice in excluding her from Jokers because she and Sparkman were treated equally.

Iowa Code § 216.7(1)(a)

> makes it an unfair or discriminatory practice for a public accommodation [t]o refuse or deny to any person because of . . . sex . . . the accommodations, advantages, facilities, services, or privileges thereof, or otherwise to discriminate against any person because of . . . sex . . . in the furnishing of such accommodations, advantages, facilities, services, or privileges.

*Chiavetta v. Iowa Bd. of Nursing*, 595 N.W.2d 799, 802 (Iowa 1999). This statute should be "construed broadly to eliminate unfair and discriminatory practices in public accommodations." *Ladd v. Iowa West Racing Ass'n*, 438 N.W.2d 600, 602 (Iowa 1989). A "public accommodation" is defined, in part, as follows:

> [E]ach and every place, establishment, or facility of whatever kind, nature, or class that caters or offers services, facilities,

---

[7]  Having concluded that each of Greer's Title VII claims are insufficient to survive summary judgment, the court declines to address Defendants' alternate argument that certain Defendants were improperly named as Title VII defendants.

> or goods for a fee or charge to nonmembers of any
> organization or association utilizing the place, establishment,
> or facility . . . . Public accommodation shall not mean any
> bona fide private club or other place, establishment, or facility
> which is by its nature distinctly private, except when such
> distinctly private place, establishment, or facility caters or
> offers services, facilities, or goods to the nonmembers for fee
> or charge or gratuitously, it shall be deemed a public
> accommodation during such period.

Iowa Code § 216.2(12).

As an initial matter, Defendants argue that summary judgment should be granted because Jokers is not a "public accommodation" during the Monday night parties because the parties are private and held for clients and handlers of EPI, Goodwill and similar agencies. Defendants argue that, since the general public was neither invited to attend the parties nor welcome to attend the parties, Jokers was not a "public accommodation." Greer argues that, although the parties were private, the general public was allowed to enter if they so chose.

The court agrees with Greer on the question of whether Jokers was a "public accommodation" during the Monday night non-alcoholic parties that were held for individuals with disabilities. A reasonable jury could find that Jokers is a public accommodation. The evidence shows that, although Jokers was "closed" for the non-alcoholic parties early on Monday nights, if members of the public arrived at the door, the door staff would explain the event that was taking place and give the member of the public the option of whether to enter or not. Plaintiff's App. at 56; Defendants' App. at 196. Non-disabled patrons from the public could attend the parties if they chose to attend. *Id.* at 223. There is a disputed issue of material fact regarding whether Jokers is a "public accommodation" during the Monday night non-alcoholic parties.

Regardless of whether Jokers qualifies as a "public accommodation," the court finds the record contains no evidence that Greer was excluded because she is a woman. Because Greer raised no material issue of fact regarding whether she was excluded because of her sex, the court shall grant Defendants' Motion on Count V.

The language of section 216.7(1)(a) is "clear and plain." *See Ladd*, 438 N.W.2d at 602 (interpreting section 216.7's predecessor, section 601A.7(1)(a)). "By its terms, the statute makes it an unlawful practice to discriminate against any person *because of sex* in the furnishing of the accommodations, advantages, facilities, services, or privileges of any public accommodation." *Id.* (emphasis added). Greer was excluded from Jokers in November 2001 *because of* the no-contact order, not *because* she is a woman. With regard to being admitted on alternating Monday nights, Greer and Sparkman were treated identically by the staff at Jokers.

Although there is a factual dispute regarding whether Greer agreed to the alternating Monday night schedule, such a dispute is not material. *See* Defendants' App. at 17-18 (Greer claims she never had conversations with Sparkman's job coach, Chris Reints, about alternating Monday nights and never agreed to such a schedule). Regardless of whether Greer agreed to be excluded from the Jokers' parties every other Monday night or whether others created the schedule for her or on her behalf, she was never excluded because she is a woman. The evidence shows she was excluded on some nights and Sparkman was excluded on others because the no-contact order prohibited Sparkman from having any contact with Greer. *See id.* at 202 (door staff of Jokers explained that if either Greer or Sparkman showed up for the Monday night non-alcoholic party on a night that was designated for the other one, the door staff would "ask them to leave nicely").

Greer cannot prove sex discrimination in public accommodations because she has not shown she was asked to leave Jokers on November 12, 2001, because of her sex. Accordingly, the court shall grant Defendants' Motion on Count V.

### D. Greer's Retaliation in Public Accommodations Claim (Count VI)

In Count VI of the Complaint, Greer alleges she was wrongly denied access to the Monday night party on November 12, 2001, at Jokers in retaliation for filing discrimination actions with the Waterloo Commission on Human Rights, the Iowa Civil Rights Commission and the United States Equal Employment Opportunity Commission. She alleges a violation of Iowa Code § 216.11. Defendants argue that summary judgment is appropriate on Count VI because Greer produced no evidence showing that the individuals who drafted or enforced the alternating nights schedule knew about her discrimination actions. They further argue that she was "turned away" from Jokers on Monday, November 12, 2001, by a representative from Goodwill, rather than by a Jokers employee.

Section 216.11(2) of the Iowa Code provides that it is an unfair or discriminatory practice for anyone "to discriminate or retaliate against another person in any of the rights protected against discrimination by this chapter . . . ." Iowa Code § 216.11(2). As stated above, the ICRA makes it "an unfair or discriminatory practice for any owner, lessee, sublessee, proprietor, manager, or superintendent of any public accommodation" to refuse or deny individuals because of his or her sex. Iowa Code § 216.7(1)(a).

Although there is a dearth of case law discussing what needs to be established when retaliation in public accommodations is alleged, the court finds the following elements must be proven: (1) Greer engaged in a protected activity; (2) the Jokers Defendants were aware that the employee participated in the protected activity; (3) the Jokers Defendants took some adverse action against Greer subsequent to their obtaining knowledge that Greer had

29

engaged in the protected activity; and (4) there is a causal connection between the protected activity and the adverse action taken against Greer (i.e., the Jokers Defendants took adverse action against Greer *because of* her participation in the protected activity). *See Sherpell v. Humnoke School Dist. No. 5 of Lonoke Co., Ark.*, 874 F.2d 536, 540 (8th Cir. 1989) (setting forth factors 1, 3 and 4 in a retaliatory discharge case); *Couty v. Dole*, 886 F.2d 147, 148 (8th Cir. 1989) (setting forth factor 2 in a retaliatory discharge case); B. Schlei and P. Grossman*, Employment Discrimination Law* at 436-40 (1976) and 124-25 (1979 Supp.) (setting forth all four factors in a retaliatory discharge case).

There is no question that Greer's filing a formal discrimination action is a protected activity. *See Channon v. United Parcel Service, Inc.*, 629 N.W.2d 835, 862 (Iowa 2001) (explaining that retaliation can occur even when an employee has not filed a formal complaint with an equal employment commission or agency). Moreover, there is no dispute of material fact regarding whether Defendants knew Greer had engaged in a protected activity. Beck, the owner of Jokers, certainly knew that Greer filed formal discrimination actions against Defendants by November 12, 2001. After learning about the discrimination actions, Beck testified that he approved of Reints' recommendation that Sparkman and Greer alternate attendance at the Monday night parties due to the no-contact order. *See* Defendants' App. at 195 (explaining that Reints called Beck prior to November 12, 2001, and recommended an alternating schedule for Greer and Sparkman due to the no-contact order so that Sparkman could attend the Monday night parties).

Nonetheless, summary judgment is not appropriate on Count VI because material questions of fact remain regarding whether the Jokers Defendants took some adverse action against her. It is unclear whether Greer was asked to leave Jokers on Monday, November 12, 2001, by a Goodwill employee, namely Kelly Moat (*id.* at 18), or by a member of Jokers' staff (*id.* at 202). Apart from the fact that the record does not establish

who enforced the schedule, it is not clear from the record that Jokers' staff was involved in creating the alternating nights schedule. *Compare id.* at 195 (testifying that EPI and Goodwill representatives created the schedule), *with id.* at 202 (testifying that Jokers manager Brad Flanagan, Greer, Sparkman and their handlers created the alternating night schedule), *and id.* at 46 (testifying that Reints originated the idea for the alternating night schedule).

Finally, a dispute of material facts exists regarding the causal connection between the action taken against Greer on November 12, 2001, and the fact that Greer engaged in a protected activity. Beck and a member of Jokers' door staff testified that Greer was not banned from the club because she broke any rules or acted outrageously during the times she had attended Jokers' Monday night non-alcoholic parties. *Id.* at 196; Plaintiff's App. 55. Beck further testified that, as a bar owner, he has dealt with no-contact orders in the past. Plaintiff's App. at 55. In other situations, Beck and his staff would call the police to deal with individuals and their respective no-contact orders. *Id.* Therefore, the court finds that there is a material question of fact regarding the causal connection between Greer's protected activity and her exclusion from Jokers.

Defendants' Motion is denied as to Count VI.

### E. Greer's Public Policy Claim (Count I)

In Count I of the Complaint, Greer alleges she was wrongfully discharged in violation of Iowa public policy. She argues that she would not have been terminated "but for" the no-contact order and her termination violated a well-recognized and defined public policy in the State of Iowa which seeks to ensure the safety of domestic violence victims, ensure their access to legal protection, promote their employment and economic security and encourage cooperation with the criminal justice system.

In their Motion, Defendants ask the court to "dismiss" Greer's Complaint in its entirety (docket no. 68-2 at 6). However, they do not specifically discuss the merits of Greer's wrongful discharge claim. Instead, Defendants merely argue that the court should decline to exercise supplemental jurisdiction over the claim if it enters judgment in favor of Defendants on the Title VII claims in the case. *See* docket no. 73. Defendants cannot succeed on their Motion with regard to Count I because they have failed to make any substantive arguments showing why summary judgment is appropriate. *See Hartnagel*, 953 F.2d at 394 (explaining that the moving party has the initial burden and responsibility of showing why summary judgment is appropriate).

Even if the court considers each of Defendants' other arguments in analyzing Count I, the court finds summary judgment is not appropriate on Count I. In order to succeed with respect to Greer's claim of wrongful discharge in violation of public policy, Defendants must show there are no disputed material facts regarding the following elements:

> (1) The existence of a clearly defined public policy that protects an activity. (2) This policy would be undermined by a discharge from employment. (3) The challenged discharge was the result of participating in the protected activity. (4) There was a lack of other justification for the termination.

*Lloyd v. Drake University*, 686 N.W.2d 225, 228 (Iowa 2004) (citing *Davis v. Horton*, 661 N.W.2d 533, 535 (Iowa 2003)); *see also Teachout v. Forest City Cmty. Sch. Dist.*, 584 N.W.2d 296, 299 (Iowa 1998) (identifying the elements as (1) engagement in protected activity; (2) discharge; and (3) a causal connection between the conduct and the discharge). "[I]n the wrongful discharge context 'the elements of causation and motive are factual in nature and generally more suitable for resolution by the finder of fact.'" *Lloyd*, 686

N.W.2d at 229 (citing *Fitzgerald v. Salsbury Chem., Inc.*, 613 N.W.2d 275, 282 (Iowa 2000)).

The court finds that, at the least, there are disputed issues of material fact regarding elements three and four of Greer's wrongful discharge claim. Viewing the evidence in the light most favorable to Greer, a reasonable jury could find that she was discharged because she obtained a no-contact order. After months of being verbally reprimanded for tardiness and absenteeism and after being repeatedly counseled and given the benefit of the doubt, Greer was terminated within a week of obtaining the no-contact order. The timing of the termination raises a material issue of fact. *See Smidt*, 695 N.W.2d at 15 (explaining that employer's legitimate, nondiscriminatory reason for terminating a pregnant plaintiff was "particularly suspicious" given the fact that she was terminated when she was seven months pregnant and on the day before she was scheduled to discuss her maternity leave with her supervisor). Defendants justified Greer's termination by arguing she was terminated because of her problems with tardiness and absenteeism, and because the no-contact order existed. Although there is no evidence in the record that Greer was terminated because she is a woman, there is evidence in the record that she was terminated because of the no-contact order. A fact-finder could determine Greer would not have been terminated but for the no-contact order.

The court shall, therefore, deny Defendants' Motion on Count I.

## VI. *SUPPLEMENTAL JURISDICTION*

In their Reply brief, Defendants argue that, if the court does not grant summary judgment on Count I, it should decline to exercise supplemental jurisdiction over the claim because it is based upon state law. Both of the remaining counts, Counts I and VI, involve purely state law claims – that is, Iowa public policy and Iowa Code § 216.11. Title 28, United States Code, Section 1367(a) provides:

> Except as provided in subsections (b) and (c) or as expressly provided otherwise by Federal statute, in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution. Such supplemental jurisdiction shall include claims that involve the joinder or intervention of additional parties.

28 U.S.C. § 1367(a). However, Section 1367(c), in pertinent part, provides: "The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if— . . . (3) the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3).

In discussing 28 U.S.C. § 1367(c), the United States Supreme Court has urged district courts to "'consider and weigh in each case, and at every stage of the litigation, the values of judicial economy, convenience, fairness, and comity'" when deciding whether to exercise supplemental jurisdiction. *City of Chicago v. Int'l Coll. of Surgeons*, 522 U.S. 156, 173 (1997) (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988)). The Supreme Court has also remarked:

> [I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered . . . —judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims.

*Cohill*, 484 U.S. at 350 n.7. The Supreme Court cautioned, however, that this is not a mechanical rule to be applied in all cases. *Id.*

The court concludes that the values of judicial economy, convenience and fairness weigh in favor of retaining supplemental jurisdiction over Counts I and VI. Having

decided the Motion, the court is now familiar with the case. The court invested substantial judicial resources in learning the record and resolving issues within this case. Moreover, the court notes that trial is scheduled for January 17, 2006, which is now less than one month away. The parties have begun to prepare for the trial, including retaining expert witnesses, participating in a pretrial conference and filing motions in limine, witness lists, exhibit lists and proposed orders. It would be unfair, inconvenient and a waste of judicial resources to dismiss the case at this late stage.

The procedural posture of this case is similar to the situation presented in *Grain Land Coop. v. Kar Kim Farms, Inc.*, 199 F.3d 983 (8th Cir. 1999). In *Grand Land*, the plaintiff and defendant brought a mix of federal and state claims against one another. *Id.* at 988. The district court granted the plaintiff's motion for partial summary judgment on the federal claims. *Id.* at 989. The district court, however, retained jurisdiction over the state law claims because they were related to the federal claims. *Id.* Recognizing the Supreme Court's admonition in *Cohill*, the Eighth Circuit Court of Appeals, nonetheless, held the district court did not abuse its discretion in continuing to exercise supplemental jurisdiction over the state law claims. *Id.* at 993. The court upheld the district court's ruling on account of "the considerable resources invested by the court in arriving at its summary judgment ruling." *Id.* (citing *Murray v. Wal-Mart, Inc.*, 874 F.2d 555, 558 (8th Cir. 1989)); *accord Pioneer Hi-Bred Int'l v. Holden Found. Seeds, Inc.*, 35 F.3d 1226, 1242 (8th Cir. 1994) ("It is the law in this circuit that the substantial investment of judicial time and resources in the case . . . justifies the exercise of jurisdiction over the state claim, even after the federal claim has been dismissed." (internal quotation marks omitted)). Here, the court has invested substantial resources in the instant action, just as the district court did in *Grain Land*. Accordingly, the court deems it appropriate to exercise supplemental jurisdiction over Counts I and VI.

## VII. CONCLUSION

For the foregoing reasons, it is hereby **ORDERED:**

(1)     Defendants' Motion for Summary Judgment (docket no. 68) is hereby **GRANTED** as to Counts II, III, IV and V, and is hereby **DENIED** as to Counts I and VI; and

(2)     The trial on the remaining counts (Counts I and VI) will take place as set forth in the separate Trial Scheduling Order filed on today's date.

**IT IS SO ORDERED.**

**DATED** this 4th day of January, 2006.

LINDA R. READE
JUDGE, U. S. DISTRICT COURT
NORTHERN DISTRICT OF IOWA